UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

KEISHNA L. BUNN,

        Plaintiff,

    v.

NANCY A. BERRYHILL,

        Defendant.

Case No. 18-cv-00384-LB

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Re: ECF Nos. 26, 27

### INTRODUCTION

The plaintiff — Keishna L. Bunn — seeks judicial review of a final decision by the Commissioner of the Social Security Administration denying her claim for Title XVI Supplemental Security Income ("SSI").[1] The plaintiff moved for summary judgment, and the Commissioner opposed the motion and filed a cross-motion for summary judgment.[2] All parties consented to magistrate-judge jurisdiction.[3] Under Civil Local Rule 16–5, the matter is submitted

---

[1] Mot. – ECF No. 26 at 6. Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents. The plaintiff also applied for Title II Social Security Disability benefits. *Id.* Because her onset date is later than the date last insured for her Title II benefits, this suit involves only the application for SSI benefits. *Id.*

[2] *Id.*; Cross-Mot. – ECF No. 27.

[3] Consent Forms – ECF Nos. 9, 10.

for decision by this court without oral argument. The court grants the plaintiff's motion for summary judgment and remands the case for reconsideration.

## STATEMENT

### 1. Procedural History

The plaintiff was born on August 2, 1973.[4] On September 20, 2013, she applied for Social Security Income under Title XVI of the Social Security Act.[5] The plaintiff alleged eight conditions: major depression, urge incontinence, gastroesophageal reflux disease, pancreatitis, left-arm injury, paresthesia, lower-back pain, and attention-deficit-hyperactive disorder ("ADHD").[6] The plaintiff originally alleged an onset date of June 26, 2008.[7] Later she amended her onset date to September 2, 2013.[8] The last date she worked was June 25, 2008, and her date last insured was March 31, 2010.[9]

On March 16, 2016 the ALJ held a hearing and heard testimony from the plaintiff (who was represented by an attorney).[10] A Vocational Expert ("VE") also testified.[11] The ALJ issued an unfavorable ruling on August 12, 2016.[12] The plaintiff filed a request for review with the Appeals Council, which denied the request on November 14, 2017.[13] The plaintiff filed this action on

---

[4] AR 235.

[5] *Id.*

[6] AR 101.

[7] AR 235.

[8] AR 375.

[9] *Id.*

[10] AR 47–48.

[11] 48.

[12] AR 25–27.

[13] AR 1–4.

January 17, 2018.[14] She moved for summary judgment on November 5, 2018, and the defendant filed a cross-motion for summary judgment on December 3, 2018.[15]

## 2. Summary of Administrative Record

### 2.1 Tom Soleng, M.D. — Treating

The plaintiff saw Dr. Soleng at the Pathways to Wellness Medication Clinic on July 20, 2010.[16] Dr. Soleng noted that the plaintiff's "mental health issues started with a bad relationship."[17] The plaintiff had last worked in 2008 and was feeling more isolated and sleeping more.[18] The plaintiff reported using alcohol and marijuana.[19] She did not express any suicidal behavior.[20] Dr. Soleng found that the plaintiff had "moderate" difficulties in maintaining concentration and persistence or place, "mild" restriction of activities of daily living and difficulties maintaining social functioning, and no episodes of decompensation.[21] He diagnosed her with major-depressive disorder and obesity.[22]

On August 19, 2010, Dr. Soleng noted that the plaintiff had an appropriate affect, linear thought process, and intact memory.[23] Her attention, concentration, judgment, and insight were good.[24] She did not pose a danger to herself or others.[25] The plaintiff was "mildly depressed" and

---

[14] Compl. – ECF No. 1.

[15] Mot. – ECF No. 26; Cross-Mot. – ECF No. 27.

[16] AR 403.

[17] Id.

[18] Id.

[19] AR 405.

[20] Id.

[21] AR 407.

[22] Id.

[23] AR 402.

[24] Id.

[25] Id.

"stable generally."[26] During her treatment at Pathways to Wellness, the plaintiff was prescribed Cymbalta, Prozac, and Klonopin.[27]

### 2.2 Kaiser Physicians (Pain) — Treating

On August 11, 2013, the plaintiff had an appointment at Kaiser because the night before, at a function, she was "grabbed" and "manhandled" and had her arm twisted.[28] Thereafter, the plaintiff saw several physicians at Kaiser for issues related to her shoulder and arm pain. The Kaiser records span from June 2007 through January 2016.[29]

On August 13, 2013, Renee Pacheco, M.D., performed an evaluation of the plaintiff's "arm pain and numbness after [a] physical altercation at 'Club' on 8/10."[30] She reported that her arm and shoulder were bent backward.[31] The plaintiff had been taking ibuprofen for the pain without relief.[32] She reported discomfort in her left shoulder and "tingling, discomfort and weakness" in her left palm and fingers.[33] Dr. Pacheco ordered x-rays.[34] The x-ray of her spine showed "[m]ild degenerative change," the x-ray of her left shoulder showed "[c]hronic appearing spurring," and the x-ray of her left elbow showed "[m]inor chronic spurring."[35] Derek Kubota, M.D. analyzed x-rays of the plaintiff's left shoulder, left elbow, and cervical spine on August 13, 2013.[36] Dr. Kubota did not find any "visible acute abnormalit[es]" in the shoulder or elbow images.[37] He

---

[26] *Id.*

[27] AR 400.

[28] AR 690.

[29] *See* AR 411–1293.

[30] AR 692–93.

[31] AR 693.

[32] *Id.*

[33] *Id.*

[34] AR 694.

[35] AR 696–698.

[36] AR 696–701.

[37] AR 696–699.

noted "mild degenerative change" in the cervical spine image.[38] Dr. Pacheco reviewed the x-rays and Dr. Kubota's findings with the plaintiff over the phone.[39]

On August 14, 2013, Tara Shaw, M.D., reported that the plaintiff said that her symptoms (pain in her left shoulder and paresthesia down her arm to her hand) were getting worse.[40] She was "barely able to squeeze with [her] hand or tolerate light touch."[41] The plaintiff was "in mild to moderate distress and sitting uncomfortably with [her] left arm propped on [a] pillow."[42] The plaintiff had intact motor strength in her hand and wrist but was "hypersensitive to any light touch."[43] The plaintiff had a limited range of motion in her left shoulder and was not willing to allow Dr. Shaw to test her cuff strength due to pain.[44] Dr. Shaw diagnosed the plaintiff with brachial neuritis and recommended prednisone (for pain), physical therapy, ice, and gentle stretching.[45]

On August 18, 2013, the plaintiff told Leslea Ann Brickner-Goth, M.D., that the swelling and pain in her arm and elbow was worse.[46] Dr. Goth ordered a repeat x-ray and told the plaintiff that "this type of nerve pain [could] take a while to improve."[47]

On August 19, 2013, Dr. Kubota examined more x-rays of the plaintiff's left elbow and shoulder.[48] He found no visible abnormality in her elbow and found "[s]light spurring" and "[s]light degenerative change" in her shoulder.[49]

---

[38] AR 700.
[39] AR 703.
[40] *Id.*
[41] *Id.*
[42] *Id.*
[43] *Id.*
[44] *Id.*
[45] AR 705.
[46] AR 708.
[47] AR 709.
[48] AR 710–13.
[49] AR 712–13.

On August 21, 2013, Garrick Amgott-Kwan, M.D., (the plaintiff's treating physician) reported that the plaintiff had to hold her left arm "flexed to reduce pain."[50] The plaintiff had not seen any change since starting on prednisone and was not helped by Norco.[51] Dr. Amgott-Kwan examined the plaintiff and reported that she was guarding her left arm and holding it close to her body.[52] She had mild pain in her neck "with rightward rotation."[53] Dr. Amgott-Kwan was "unable to perform manual motor testing on [the plaintiff's left arm] due to pain/allodynia."[54] The plaintiff showed signs suggesting "possible early complex regional pain syndrome."[55] He prescribed gabapentin (for pain), gave the plaintiff a sling, and instructed her to do a full range of motion in all joints of her left upper extremity several times a day.[56]

On September 4, 2013, Dr. Pacheco spoke with the plaintiff on the phone.[57] The plaintiff complained of "ongoing severe arm pain" and said she was unable to sleep at night.[58] Her pain was an "8/10" until she took gabapentin and then it would drop down to "6/10" for three hours before increasing again.[59] The plaintiff was not going to physical therapy "due to pain" but agreed to make an appointment.[60] Dr. Pacheco increased the plaintiff's dose of gabapentin.[61]

---

[50] AR 715.

[51] Id.

[52] AR 716.

[53] Id.

[54] Id. "Allodynia is 'pain resulting from a non-noxious stimulus to normal skin.'" *Moraine v. Soc. Sec. Admin.*, 695 F. Supp. 2d 925, n.18 (D. Minn. 2010) (citing *Dorland's Illustrated Medical Dictionary* 52 (31st Ed. 2007)).

[55] AR 717.

[56] Id.

[57] AR 721.

[58] Id.

[59] Id.

[60] AR 722.

[61] Id.

On September 11, 2013, the plaintiff told Dr. Amgott-Kwan that the gabapentin was giving her only mild relief for a few hours.[62] Dr. Amgott-Kwan diagnosed the plaintiff with complex regional pain syndrome (type 2) in her left arm.[63] He increased her dosage of gabapentin and prescribed nortriptyline (for nerve pain).[64]

The plaintiff saw physical therapist Donaldo Beroncal on September 19, 2013.[65] The plaintiff said moving or hanging her left arm by her side aggravated the pain.[66] Mr. Beroncal found that the plaintiff had a "slight" range of motion in her left shoulder due to pain and pain bending to the right.[67] The plaintiff had "hypersensitivity to touch" on her left arm.[68] Mr. Beroncal said the plaintiff's rehabilitation potential was "good" and prescribed physical therapy once a week for twelve weeks.[69] He developed a physical-therapy plan and included a home-exercise program with certain movements and stretches.[70]

On September 25, 2013, the plaintiff told Dr. Pacheco that she was "feeling depressed and anxious due to chronic ongoing pain . . . as well as new events . . . related to a [boyfriend]."[71] The plaintiff reported having suicidal ideation the day before but not at the time of the call.[72] She said that she might need more clonazepam.[73] Dr. Pacheco recommended that the plaintiff participate in

---

[62] AR 725.

[63] AR 726.

[64] AR 726.

[65] AR 728.

[66] AR 729.

[67] AR 730.

[68] *Id.*

[69] AR 728–29.

[70] AR 731.

[71] AR 733.

[72] *Id.*

[73] *Id.*

groups for depression and call Alameda Alliance for a psychiatric evaluation.[74] Dr. Pacheco did not recommend adding other medications.[75]

On October 15, 2013, the plaintiff was unable to rotate her left shoulder more than 45 degrees "due to pain."[76] Dr. Amgott-Kwan was unable to test the plaintiff's motor strength in her left arm because of pain.[77] He reduced the plaintiff's dose of gabapentin and prescribed Percocet.[78]

On November 6, 2013, Jun Yang, M.D., performed a "limited exam" of the plaintiff's left shoulder "due to [her] apprehension and pain."[79] Dr. Yang also reviewed an MRI that showed "low grade partial thickness RC tear vs tendinitis, subchondroal cyst at GT, no frank labral tear" in the plaintiff's shoulder and "[m]ild-moderate C5-7 degenerative spondylosis with left paracentral C5-6 disc protrusion abutting the spinal cord [and] [m]oderate left C6-7 neural foraminal narrowing" in her spine.[80] Dr. Yang did not find a clear indication for surgery or intervention.[81]

On November 20, 2013, the plaintiff had "[m]odest pain improvement with [her] current regimen."[82]

On December 11, 2013, the plaintiff was having a high level of ongoing pain despite taking four pain medications (fentanyl, nortriptyline, carbamazepine, and gabapentin).[83] Dr. Pacheco advised that it was unlikely that surgery could fix the plaintiff's problem.[84] She said that she

---

[74] *Id.*

[75] *Id.*

[76] AR 744.

[77] *Id.*

[78] *Id.*

[79] AR 761–62.

[80] AR 762.

[81] *Id.*

[82] AR 764.

[83] AR 766.

[84] AR 767.

would ask the plaintiff's primary physician (Dr. Amgott-Kwan) whether the plaintiff should be enrolled in Kaiser's chronic-pain program.[85]

On January 22, 2014, the plaintiff felt something was "mechanically wrong in her shoulder" and wanted to be checked by an orthopedist again.[86] The plaintiff felt depressed and had suicidal thoughts but no "active plan or intent."[87] Dr. Pacheco referred the plaintiff for a psychiatric consult.[88]

On January 29, 2014, Dr. Shaw reported that the plaintiff used her arm more than she did at the last visit but was "still protecting it."[89] The plaintiff was hypersensitive to touch in her left shoulder.[90] The plaintiff had improved her range of motion and used her left arm for cooking.[91] Dr. Shaw ordered a sling (per the plaintiff's request) but told the plaintiff that she should only wear it while exercising.[92] Dr. Shaw noted that she declined to prescribe muscle relaxants.[93]

On April 23, 2014, Taissa Cherry, M.D., performed a nerve-blocking injection.[94] Dr. Cherry said it was "potentially not [a] complete block" and she would need to "see if there [was a] benefit over time."[95] She recommended a second injection.[96]

---

[85] *Id.* Dr. Amgott-Kwan later determined that the plaintiff was not a candidate. AR 794.

[86] AR 779.

[87] *Id.*

[88] AR 782.

[89] AR 786.

[90] *Id.*

[91] *Id.*

[92] AR 787.

[93] *Id.*

[94] AR 823–27.

[95] AR 827.

[96] *Id.*

On July 1, 2014, the plaintiff reported to Dr. Pacheco that she had "severe constipation with bloody [bowel movements]" and that she went "off her opiates for [two] days at a time just to relieve her gut."[97]

On July 9, 2014, the plaintiff reported that she had "no response" to the nerve-block injection and was not sure she wanted to do another one.[98] Her pain was "a little better" and she was able to use her left arm more.[99] Dr. Amgott-Kwan prescribed topical lidocaine.[100]

On October 23, 2014, the plaintiff's pain was "no better" and she felt that she had "setback compared to [her] last visit."[101] Her left arm strength "seem[ed] full throughout," and she had marked allodynia to her left hand and wrist.[102] The plaintiff was going to stop her nonsteroidal anti-inflammatory pain medications for a while to help her constipation, so Dr. Amgott-Kwan prescribed Percocet for "severe flares."[103]

On December 30, 2014, the plaintiff went to the hospital complaining of abdominal pain, vomiting, and diarrhea that had lasted two weeks.[104] She was discharged on January 3, 2015 after her symptoms were controlled.[105]

A January 2015 x-ray showed "[m]inimal degenerative change" but no fracture in the plaintiff's left wrist.[106]

On February 12, 2015, Dr. Cherry administered a 30-hour ketamine infusion.[107] On June 2, 2015, the plaintiff returned to Dr. Cherry saying that the ketamine infusion gave her "very good

---

[97] AR 856.

[98] *Id.*

[99] *Id.*

[100] AR 858.

[101] AR 871.

[102] AR 872.

[103] AR 873.

[104] AR 967.

[105] AR 993.

[106] AR 1107–08.

[107] AR 996.

relief" for a week and then the pain slowly returned.[108] Dr. Cherry started a lidocaine infusion but the plaintiff "became agitated" so she stopped it.[109]

From August 31 to September 3, 2015, Dr. Cherry administered a four-day ketamine infusion.[110] During the infusion the plaintiff felt "nervous" and asked for "something for anxiety."[111] The plaintiff's pain ranged from a five to a seven out of ten while she was admitted.[112] The plaintiff had concerns about being able to control her pain at home.[113]

The plaintiff had a 28-hour ketamine infusion on January 14, 2016.[114] Dr. Cherry noted that she could "do activities of daily living and walking, but should not lift anything heavier than a phonebook, and avoid vigorous activity" until her next visit.[115]

On June 3, 2016, Dr. Amgott-Kwan submitted a medical-source statement.[116] He listed the plaintiff's diagnosis as "complex regional pain syndrome type 2, left arm" and her prognosis as "poor."[117] He wrote that the plaintiff had "unremitting neuropathic pain [in her] left arm/hand."[118] He characterized the pain as "burning, hypersensitive (allodynia), [and] electrical."[119] His clinical findings and objective signs regarding the plaintiff's pain were "diffuse allodynia. . . mid-left hand atrophy, left hand edema, [and] skin temperature changes."[120] Dr. Amgott-Kwan listed nine

---

[108] AR 1035.

[109] Id.

[110] AR 1041.

[111] Id.

[112] Id.

[113] Id.

[114] AR 1056.

[115] Id.

[116] AR 1290–91.

[117] AR 1291.

[118] Id.

[119] Id.

[120] Id.

treatments that had failed, and listed the plaintiff's current treatments including Ketamine and lidocaine.[121]

Dr. Amgott-Kwan noted that depression and sleep disturbance affected the plaintiff's physical conditions.[122] The plaintiff's pain would "constantly" be severe enough to interfere with the "attention and concentration needed to perform even simple work tasks."[123] The plaintiff would need to rest for 10 to 20 minutes every 15 to 30 minutes during the workday.[124] The plaintiff could "rarely" lift up to 10 pounds, and could never lift over 20 pounds.[125] During a regular eight-hour work day, the plaintiff could reach (extend her arms and hands in any direction) for less than 30 minutes, could handle (seize, hold, grasp, turn, or otherwise work with her hands) for less than 30 minutes, could finger (pick, pinch, or otherwise work primarily with the fingers) for less than 30 minutes, and could feel (perceive attributes of objects) for 30 minutes.[126] The plaintiff was in constant severe pain.[127]

### 2.3    Kaiser Mental Health — Treating

The patient saw several providers for issues related to her mental health at Kaiser between January 2014 and December 2015.[128]

Gene Riddle, Ph.D., a psychologist, performed an initial screening of the plaintiff on January 28, 2014.[129] The plaintiff had "intermittent" suicidal ideation but denied intent and had had "some

---

[121] *Id.*

[122] AR 1292.

[123] *Id.*

[124] *Id.*

[125] *Id.* "Rarely" was defined on the form as 1% to 5% of an 8-hour working day.

[126] AR 1293.

[127] *Id.*

[128] *See* AR 794–1275.

[129] AR 794–95.

harmful thoughts towards others" but denied a history of assault.[130] The plaintiff had a "history of battering in relationships."[131]

The plaintiff saw Linda Kim, M.D., on February 11, 2014.[132] The plaintiff described her symptoms, including isolating herself from others, lacking energy and motivation, sleeping too much or not enough, and binge-eating.[133] The plaintiff's mood was "depressed and dysphoric."[134] The plaintiff was fully oriented and her attention and concentration were "within normal limits."[135] Her memory was "intact," her insight was "fair," and her impulse control and judgment were "good."[136] Dr. Kim diagnosed the plaintiff with major depression and prescribed Prozac.[137]

On March 19, 2014, the plaintiff saw James Duffy, M.D., for medication management.[138] The plaintiff said she "experienced a very significant increase in her anxiety and hypervigilance with Prozac."[139] She had a good night's sleep with Remeron but was "concerned that it would also make her anxious."[140] She reported that klonopin (which she received from a doctor at Pathways to Wellness) "produced a prompt and very significant improvement in her distress."[141] Dr. Duffy diagnosed the plaintiff with PTSD (with a history of severe domestic abuse).[142] He prescribed

---

[130] AR 795.

[131] Id.

[132] AR 796.

[133] AR 798.

[134] AR 801.

[135] Id.

[136] Id.

[137] AR 796–97.

[138] AR 806.

[139] AR 808.

[140] Id.

[141] Id.

[142] AR 806.

klonopin and buspar (to reduce arousal).[143] He recommended that she go to the Kaiser trauma group and advised her to exercise.[144]

The plaintiff saw Sangita Sungu, a Licensed Clinical Social Worker, on June 30, 2014.[145] The plaintiff complained of various symptoms of depression.[146] She said she was experiencing "panic attacks" and had "a poor appetite, trouble sleeping, [and] low energy."[147] The plaintiff "ha[d] thoughts of hurting herself" but "would not inflict harm on herself because of her children."[148] The plaintiff was "tearful and fidgety," and her mood was "anxious and sad."[149]

On July 9, 2014, Ms. Sungu reported that the plaintiff's mood "continue[d] to worsen," and she was still having panic attacks.[150] Her medication was not working.[151] The plaintiff was able to take her dog out for a walk and was "able to take care of her children."[152]

On July 28, 2014, the plaintiff "exhibit[ed] very significant symptoms of posttraumatic stress disorder," which appeared to Dr. Duffy to be "amplified compared to [his] previous evaluation."[153] She was "experiencing escalating panic attacks" and was "becoming increasingly housebound."[154] The plaintiff was "clearly manifesting a downward spiral in her symptoms and functional capacity" and Dr. Duffy "strongly recommended" that she start an intensive outpatient program.[155]

---

[143] AR 814.

[144] Id.

[145] AR 1118.

[146] AR 1119.

[147] Id.

[148] Id.

[149] AR 1122.

[150] AR 1140.

[151] Id.

[152] Id.

[153] AR 1150.

[154] Id.

[155] Id. In August 2014, the plaintiff told Ms. Sungu that she had an intake with the intensive-outpatient program but that it was difficult for her to open up and that she could not physically do the program three times a week. AR 1167.

The plaintiff's symptoms were "unchanged" at an August 11, 2014 visit with Ms. Sungu.[156] On September 3, 2014, the plaintiff told Ms. Sungu that she was tired but unable to sleep and "[could] not get her mind to shut down."[157] On September 25, 2014, the plaintiff reported that she was "not able to do the things she could before," which was frustrating.[158]

On October 30, 2014, the plaintiff went to the emergency department at Kaiser in Oakland, California.[159] She was extremely anxious and could not sleep.[160] The doctors gave her a dose of Benadryl and she slept in the emergency room for a few hours.[161] She had a psychological consultation, and the doctor found that she did not meet criteria as a serious imminent suicide risk and was not appropriate for in-patient psychiatric treatment.[162] The plaintiff was sent home (without medication because of the plaintiff's "polypharmacy").[163]

The plaintiff returned to the emergency room at Kaiser in Oakland on November 21, 2014.[164] She had suicidal ideation and had thought about killing her children.[165] She wanted to "get off opiates."[166] Multiple doctors attributed her symptoms to opiate withdrawal (specifically from removing her fentanyl patch).[167] Berenice Perez, M.D. noted that the plaintiff did not appear clinically depressed or psychotic.[168] Dr. Perez diagnosed the plaintiff with opiate withdrawal and suicidal ideation (secondary to the withdrawal).[169] She was admitted for treatment of her

---

[156] AR 1169.

[157] AR 1175.

[158] AR 1181.

[159] AR 875.

[160] *Id.*

[161] AR 878.

[162] AR 882–83.

[163] AR 879.

[164] AR 902.

[165] AR 904.

[166] AR 909.

[167] *See* AR 924–57.

[168] AR 911.

[169] AR 912.

withdrawal symptoms.[170] The plaintiff's suicidal and homicidal ideation were resolved with management of her withdrawal symptoms and she was discharged on November 24, 2014.[171]

On December 10, 2014, the plaintiff told Ms. Sungu that her mood had been "declining" and that her pain was "unbearable" because she was in detoxing from her pain medications.[172] She had thoughts of harming her children when she was intense pain but said she would never act on it.[173]

On February 9, 2015, Dr. Duffy reported that the plaintiff had not had recent panic attacks.[174] She had trouble sleeping and had "flashbacks and nightmares relating to trauma."[175] On December 15, 2015, Dr. Duffy reported that the plaintiff had "persistent hyperviligence," and her mood was depressed.[176] She was not having flashbacks or panic attacks.[177] The plaintiff "appear[ed] improved compared to [her] last visit" and was "well dressed[ and] well groomed."[178]

On March 3, 2015 the plaintiff told Ms. Sungu that it was difficult to "do anything," and she lacked motivation.[179]

On April 1, 2015, the plaintiff told Ms. Sungu that her mood was improving until she had an incident with a former boyfriend that "set her off."[180] She could not stop crying and felt overwhelmed.[181] During the session she was "rambling" and "rocking" and was unable to manage her symptoms.[182]

---

[170] AR 957.

[171] AR 918, 920.

[172] AR 1193.

[173] *Id.*

[174] AR 1199.

[175] *Id.*

[176] AR 1267.

[177] *Id.*

[178] AR 1268.

[179] AR 1206.

[180] AR 1210.

[181] *Id.*

[182] *Id.*

On May 5, 2015, the plaintiff said that nothing felt good to her and she was "drinking almost a bottle of wine a day" and "taking [] Klonopin like skittles" but it wasn't helping.[183]

On June 16, 2015, Ms. Sungu reported that the plaintiff had "made some improvements" but was "unable to sustain progress."[184] The plaintiff had been referred to groups and outpatient treatment but was a "no show."[185] Her compliance with her treatment plan was "fair."[186]

On July 28, 2015, the plaintiff told Ms. Sungu that therapy and medication were not enough for her.[187] She had racing thoughts and felt anxious.[188] The plaintiff "was dressed and combed her hair."[189] The plaintiff said that it did "feel good when she shower[ed] and [got] dressed but it [could] be difficult to do some days."[190]

On November 5, 2015, the plaintiff told Ms. Sungu that she could no longer take klonopin and buspar because of another medication she was taking.[191]

On December 16, 2015, the plaintiff "appeared improved" compared to her last visit with Dr. Duffy.[192] She told Dr. Duffy that she had "persistent hypervigilance" and difficulty falling asleep.[193] She did not have flashbacks or panic attacks.[194] Her mood was depressed.[195] She "admit[ted] to passive thoughts of wanting to die but denie[d] any active suicidal ideation."[196]

---

[183] AR 1229.

[184] AR 1235.

[185] *Id.*

[186] *Id.*

[187] AR 1242.

[188] *Id.*

[189] *Id.*

[190] *Id.*

[191] AR 1261.

[192] AR 1268.

[193] AR 1267.

[194] *Id.*

[195] *Id.*

[196] *Id.*

On December 17, 2015, Ms. Sungu noted "some improvement" in the plaintiff's symptoms.[197] The plaintiff said that she had good days that "motivate[d] her," but when her "chronic pain [got] unmanageable, that's when her mood start[ed] to decline."[198]

### 2.4 Farah Rana, M.D. — Examining

Dr. Rana examined the plaintiff at the Pacific Health Clinic in Oakland, California on April 18, 2016.[199] The plaintiff was not "fully cooperative with examination" and exhibited "extremely pain-sensitive behavior."[200] After examining the plaintiff's left arm, Dr. Rana reported the following:

> The claimant was sitting with her left arm sitting on a pillow. She splints all the movements on her left arm. She stated that any movement would cause pain. Her nails were painted on both her hands and she had rings and bracelets [on] her left arm. She splints even the finger movements in her left hand. No hair growth or temperature variation is noted. No muscle wasting is noted in left forearm or hand. She did not cooperate with range of motion at left shoulder, elbow, or wrist joint. She has very poor left hand grip; she did not give any effort. All other joints are nontender, full range of motion, and no localized inflammation or swelling is noted.[201]

Dr. Rana provided the following functional capacity assessment:

> The claimant would have difficulty using her left upper extremity actively given her subjective pain. She does not have any sitting, standing, or walking limitations. She can carry 10 pounds frequently and 20 pounds occasionally. She can use push and pull devices up to 20 pounds. She can handle, manipulate, feel, and finger objects without any problem with her right hand. She does not have any postural limitations. She does not need any assistive device. She can take public transportation.[202]

The plaintiff could also reach, handle, finger, feel, push, and pull with her left hand "occasionally."[203]

---

[197] AR 1271.

[198] *Id.*

[199] AR 1281.

[200] AR 1282.

[201] AR 1282–83.

[202] AR 1283.

[203] AR 1286.

### 2.5    Patricia Spivey, Psy.D. — Examining

On December 13, 2013. Dr. Spivey examined the plaintiff and generated a psychological-disability assessment report.[204] The plaintiff had "anxiety and panic attacks as well as depression."[205] She denied suicidal ideation and said she was not in therapy.[206] The plaintiff could drive, cook and clean, take her children to school, go grocery shopping, and go to medical appointments.[207]

The plaintiff's attitude and behavior were "generally cooperative but low effort."[208] Her mood was "natural," and her affect was "blunted."[209] Dr. Spivey administered the WAIS-IV, the WMS-IV, and the Trailmaking A and B tests, but the scores were "not valid due to observed poor effort."[210]

Dr. Spivey diagnosed the plaintiff with an anxiety disorder and opioid dependence.[211] She did not observe "significant psychological symptoms."[212] The plaintiff's prognosis was "good with treatment" and the plaintiff "might need help to taper [her] medications."[213] Dr. Spivey concluded that the plaintiff had "moderate" impairment in her ability to maintain emotional stability and predictability, "mild" impairment in her abilities to maintain adequate concentration and attention, adapt to changes in a job routine, and withstand the stress of a routine work day, and no impairment in her abilities to follow simple and complex instructions, maintain adequate pace and

---

[204] AR 750.

[205] Id.

[206] Id.

[207] AR 751.

[208] Id.

[209] Id.

[210] AR 752. The plaintiff scored a 47 on the WAIS-IV IQ test, scored a 4 in auditory memory (0.1st percentile) and a 20 in visual memory (2nd percentile) on the WMS-IV, and showed "marked" impairment on the Trailmaking A and B tests. AR 751–52.

[211] Id.

[212] Id.

[213] Id.

persistence, complete simple and complex tasks, communicate effectively with others, and interact appropriately with co-workers, supervisors, and the public.[214]

## 2.6 Function Report

On October 21, 2013, the plaintiff filled out a function report.[215] She had "no use of her left arm and hand" and experienced "confusion [and] short temper due to pain and depression."[216] During the day she took medications, sent her children off to school, watched television, took naps, checked her children's homework, and made sure they ate dinner.[217] She received help at home from her children's grandmother and her oldest child.[218] Her conditions affected her sleep.[219] She could not wear a bra and needed help bathing and shaving the right side of her body.[220] She could not do her hair.[221] She prepared meals daily.[222] She sorted laundry, rinsed dishes, and did light cleaning (but needed encouragement to do so).[223]

She went outside to get her kids to school but would not go out if she didn't have to.[224] She drove only to drop off her children in the morning; they took the bus home.[225] She shopped for groceries and cleaning supplies once a month.[226] She did not go out alone out of "fear for [her] safety while in [the] car or in public."[227] She did not have trouble handling money.[228] Her hobbies

---

[214] AR 752–53.

[215] AR 296.

[216] AR 288.

[217] AR 289.

[218] *Id.*

[219] *Id.*

[220] *Id.*

[221] *Id.*

[222] AR 290.

[223] *Id.*

[224] AR 291.

[225] *Id.*

[226] *Id.*

[227] *Id.*

[228] AR 291–92.

included watching TV, reading, and listening to music.[229] She watched movies or went out to eat with others once a week.[230] The plaintiff did not have trouble getting along with family and friends, but her patience was "a lot shorter as well as [her] temper."[231]

The plaintiff's conditions affected her abilities to lift, reach, walk, sit, and use her left hand.[232] They also affected her memory, concentration, understanding, and ability to complete tasks.[233] She sometimes needed to have spoken instructions repeated to her.[234] She was fired from a Comcast call center because she "supposedly intimated others in training class" and "got into a verbal altercation with [another] student."[235] She did not handle stress well and did not like changes in her routine.[236] The plaintiff used an "arm brace/sling".[237] She said her medications gave her dry mouth and caused her to be drowsy, constipated, and dizzy.[238]

### 2.7 Disability Determination Explanations

During the administrative process, non-examining doctors generated two disability determination explanations ("DDE"), one related to the plaintiff's initial application and one at the reconsideration level.[239]

As part of the first DDE, Raymond Flannery Jr., Ph.D., reviewed the plaintiff's mental-health treatment records.[240] Dr. Flannery wrote that the "medical evidence in [the plaintiff's] file suggest[ed] anxiety and depression as possible psych[ological] conditions" but found that there

---

[229] AR 292.

[230] *Id.*

[231] AR 293.

[232] *Id.*

[233] *Id.*

[234] *Id.*

[235] AR 294.

[236] *Id.*

[237] *Id.*

[238] AR 295.

[239] AR 101–112, 115–130. The DDEs reflect an alleged onset date of June 26, 2008. This onset date was amended to September 6, 2013 at the hearing. AR 50–51.

[240] AR 105.

was "insufficient evidence to assess" the severity of the conditions.[241] There was insufficient evidence to substantiate the presence of a disorder under listing 12.04 (affective disorders) or listing 12.06 (anxiety-related disorders).[242]

L. Pancho, M.D., developed a residual functioning capacity ("RFC") assessment based on a review of the plaintiff's medical records.[243] Dr. Pancho found that the plaintiff could frequently lift 10 pounds and could occasionally lift 20 pounds.[244] Dr. Pancho said the plaintiff could stand and/or walk for about six hours in an eight-hour workday and could sit for six hours in an eight-hour workday.[245] The plaintiff's ability to push and pull was limited in her left upper extremity.[246] Her ability to reach was limited, but her handling, fingering, and feeling abilities were unlimited.[247] The plaintiff had no visual, communicative, or environmental limitations.[248] Based on these factors, the plaintiff had a maximum sustained-work capability for light work.[249] Dr. Pancho concluded that the plaintiff was not disabled.[250]

On reconsideration, Harvey Bilik, Psy.D., reviewed the initial findings and the plaintiff's updated records regarding her alleged mental disabilities.[251] The plaintiff had "moderate" difficulty maintaining social functioning and maintaining concentration, persistence and pace and "mild" restriction in her activities of daily living.[252] He found no repeated episodes of

---

[241] *Id.*

[242] *Id.*

[243] AR 109.

[244] *Id.*

[245] *Id.*

[246] *Id.*

[247] AR 109–10.

[248] AR 110.

[249] AR 111.

[250] *Id.*

[251] AR 122.

[252] *Id.*

decompensation of extended duration.[253] The plaintiff had medically determinable impairments, but they did not satisfy the criteria of listing 12.04 (affective disorders) or listing 12.06 (anxiety-related disorders).[254]

Regarding the plaintiff's mental RFC, Dr. Bilik concluded that the plaintiff was moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination or in proximity to others, and complete a normal workday and workweek without interruptions from psychologically based symptoms.[255] She was "not significantly limited in" her ability to carry out short, simple instructions, perform activities within a schedule, maintain regular attendance and be punctual, maintain socially appropriate behavior, and make simple work-related decisions.[256] She was "moderately limited" in her ability to interact appropriately with the general public and get along with coworkers or peers.[257] Her ability to respond appropriately to changes in the work setting was "moderately limited," but she could adapt.[258]

Ed Gallagher, M.D., reviewed the plaintiff's medical records.[259] He found that the plaintiff's statements about the intensity, persistence, and functionally limiting effects of her physical symptoms were not substantiated by the objective medical evidence in the record.[260] Dr. Gallagher concurred with Dr. Pancho's findings regarding the plaintiff's physical RFC.[261]

---

[253] *Id.*

[254] *Id.*

[255] AR 127.

[256] *Id.*

[257] AR 127–128.

[258] AR 128.

[259] AR 123–126.

[260] AR 123.

[261] AR 129.

### 3. Administrative Hearing

The ALJ held a hearing on March 16, 2016.[262] The plaintiff, who was represented by counsel, testified at the hearing.[263] VE Linda Ferra also testified.[264]

#### 3.1    The Plaintiff's Testimony

First, the ALJ confirmed that the plaintiff wanted to amend her onset date to September 6, 2013.[265] Then the ALJ questioned the plaintiff.[266] The plaintiff was not currently working and last held a paying job in 2008.[267] She was a partner in a nonprofit organization affiliated with a motorcycle club that held fundraisers, but she stopped in August 2013 because she was injured in an assault and "never went back."[268]

The plaintiff was driven to the hearing and testified that she would not have been able to take public transportation there.[269] She did not "like being around a lot of people" and was "always afraid that [she was] going to get touched or hit or bumped."[270]

The plaintiff lived with her three children (ages 13, 18, and 21) and a roommate.[271] She stopped walking her dog because her injury made her a "fall risk."[272] Her "balance and equilibrium [were] so off" that she had to hold walls to walk around her house.[273]

---

[262] AR 47.

[263] AR 49.

[264] AR 50.

[265] AR 50–51.

[266] AR 54–79.

[267] AR 54.

[268] AR 56.

[269] *Id.*

[270] AR 56–57.

[271] AR 57.

[272] AR 58.

[273] *Id.*

The ALJ asked the plaintiff to describe why she felt that she was disabled and unable to work.[274] The plaintiff said that she had "very, very, very limited use of [her] . . . left arm, from shoulder to the fingertips and [she could not] do things that she used to do."[275] The plaintiff's area of expertise was customer service (in a cubicle "sit-down setting with a computer and a headset").[276] Her last job before she was injured was as an event staffer with the San Francisco 49ers.[277] In that job, she had to stand all day with her "hands next to each other" or cup her hands behind herself, and she could not do that anymore.[278] The ALJ asked the plaintiff about her prior work for Comcast.[279] The plaintiff said her role was troubleshooting problems over the phone.[280] She was then moved from the call center to accounting, where she processed incoming payments and managed inventory.[281] She was transferred to Comcast in Sacramento in 2003, but was there for only two weeks because she had "two black eyes" and could not attend mandatory training.[282] Ms. Bunn was right-handed.[283]

The plaintiff said that her depression also kept her from working.[284] She lost her mother at an early age, and her father "wasn't really in [her] life."[285] She was in a "domestic violence relationship," which "triggered [a] downward spiral."[286] She was taken off the phones at her job because her supervisor would hear "different tones" in her voice, and sometimes she would start

---

[274] *Id.*

[275] *Id.*

[276] *Id.*

[277] *Id.*

[278] AR 58–59.

[279] AR 77.

[280] AR 78.

[281] *Id.*

[282] AR 79.

[283] AR 80.

[284] AR 59.

[285] *Id.*

[286] *Id.*

crying.[287] She hated going home to the man who was abusing her and felt that she was "just alone."[288]

The plaintiff took medications for "nerve pain, [] PTSD, [] anxiety, [] depression, and for pain."[289] She had a Fentanyl patch to treat her pain that worked well for a year before it "turned on [her]."[290] The plaintiff was not sure which medication caused her to lose her balance, but all of them had "do not drive, drowsy, sleepy" labels.[291] The ALJ asked about other side-effects from the medications, and the plaintiff said that she experienced "bloody stools [and] constant constipation" and sometimes had to wear adult diapers.[292] She had "constant dry mouth" and was "disoriented a lot."[293] She spoke very slowly and was "tired all the time."[294]

The plaintiff's doctors had tried other medications and procedures that did not work.[295] She was receiving Ketamine infusions every "one to three months" that were helpful.[296] She had to be admitted to the hospital for the infusions.[297] The plaintiff thought her doctors were giving her "regular Motrin and some weak medication called Tramadol and [she was] coming off a very high dose of Oxycodone to something low, so it [did not] work."[298]

The ALJ asked the plaintiff about her average day.[299] The plaintiff said she got her youngest child up in the morning and ready for school.[300] Then she was "just kind of in [her] bed with all of

---

[287] Id.

[288] Id.

[289] AR 60.

[290] Id.

[291] Id.

[292] AR 60–61.

[293] AR 61.

[294] Id.

[295] Id.

[296] AR 62.

[297] Id.

[298] Id.

[299] Id.

[300] Id.

these tools and special pillows and all this stuff."[301] She tried to watch television or read but could not concentrate.[302] She took "several little naps" during the day and did not sleep at night.[303] Her cooking was "very limited," and she did not have an appetite.[304]

The plaintiff did not do chores; her children helped her around the house.[305] When she was first injured, she would have her daughter help her shower, but by the time of the hearing, she could shower by herself.[306] She could dress herself "for the most part," but she had not worn a bra "since the incident."[307] Putting on and taking off jackets was "very painful."[308] The plaintiff could use the toilet by herself, but it took a long time.[309] She could not do her own hair.[310] She could not hold a glass of water with her left hand.[311] She could not cut a piece of meat "using [her] left hand and a fork in [her] right hand."[312]

The plaintiff shopped once a month for everything they needed in the house "so [she didn't] have to go back out."[313] The plaintiff did not have a driver's license and had to be driven to appointments.[314] She could not carry anything with her left arm and could carry "no more than about a ten-pound bag of potatoes" with her right.[315] Her back hurt if she sat or stood for more

---

[301] AR 63.

[302] Id.

[303] Id.

[304] Id.

[305] AR 64.

[306] AR 64, 66.

[307] AR 64–65.

[308] AR 65.

[309] Id.

[310] AR 66.

[311] AR 75.

[312] AR 76.

[313] AR 66.

[314] AR 66–67.

[315] AR 67.

than 30 minutes.[316] The plaintiff's doctors told her she needed surgery to fix her arm but she was not sure when that would happen.[317] The plaintiff drank alcohol occasionally but was concerned about mixing it with her medications.[318] She tried marijuana and was prescribed THC but did not like it.[319]

The plaintiff's attorney also asked her some questions.[320] She asked the plaintiff about the Ketamine infusions.[321] The plaintiff was admitted for either one day for a "heavy" dose or four days for a more gradual infusion.[322] Without the infusions, her pain was seven or eight out of ten.[323] After a one-day infusion, she would have three weeks of "level five" pain, and the four-day infusion lasted her almost two months.[324]

The plaintiff testified that she took "about three" naps a day lasting 20 or 25 minutes.[325] She had trouble concentrating, and it was hard to follow a television show.[326] When she went to the grocery store with her family, either her children or the checkers helped her out to the car with the groceries.[327]

The plaintiff's attorney asked about her PTSD diagnosis.[328] The plaintiff said she had "bad dreams, flashbacks of [her] assault."[329] She was afraid to go places or be around a lot of people.[330]

---

[316] AR 68.

[317] AR 68–69.

[318] AR 69–70.

[319] AR 70.

[320] *Id.*

[321] *Id.*

[322] AR 70–71.

[323] AR 71.

[324] *Id.*

[325] *Id.*

[326] AR 72.

[327] AR 72–73.

[328] AR 73.

[329] *Id.*

[330] *Id.*

Because of her depression, she sometimes stayed in bed for three days without a shower.[331] She used to be able to go out with her children and have family gatherings but could not anymore.[332] She no longer danced or worked out.[333] The attorney asked whether she would have problems dealing with other people if she were placed back in a work environment and she responded that she would because she was "snappy because [she is] in pain a lot" and would not be productive because she does not get any sleep and is drowsy all the time.[334]

### 3.2    Vocational Expert Testimony

The VE classified the plaintiff's past work with the San Francisco 49ers as "security guard" (SVP 3, light exertion).[335] The VE did not classify the plaintiff's work at Comcast.[336]

The ALJ presented the following hypothetical to the VE:

> [A]ssume a hypothetical individual the claimant's age, education and with that past job you described for me. Further assume that the individual is limited to performing light work as defined in our regulations, meaning, she can lift and/or carry 20 pounds [] occasionally, 10 pounds [] frequently, can stand, walk or sit, each, six hours out of an eight-hour workday, is limited to occasionally pushing and pulling or operating hand controls with the left upper extremity, unlimited with the right. . . can frequently climb ramps and stairs, but never climb ladders, ropes, or scaffolds, frequently balance, stoop, knee[l], crouch and crawl, cannot perform any reaching with the left upper extremity at or above shoulder level, can occasionally reach with the left upper extremity in all other directions, unlimited in the right, occasionally handle and finger with the left upper extremity, can have no concentrated exposure to vibrations, dangerous moving mechanical parts or work at unprotected heights, is limited to

---

[331] *Id.*

[332] AR 74.

[333] *Id.*

[334] AR 74–75.

[335] Specific Vocational Preparation ("SVP") is defined "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Migala v. Berryhill*, No. 17-cv-00482-EDL, 2018 WL 1989550, at *2 (N.D. Cal. Mar. 14, 2018) (citing Dictionary of Occupational Titles, App'x C, § II). "An SVP of 3 requires over one month and up to and including three months of training." *Dixon v. Astrue*, No. C-07-03370 JCS, 2008 WL 3984594, at n.2 (citing Dictionary of Occupational Titles, App'x C: Components of the Definition Trailer)

[336] *See* AR 77.

simple, routine and repetitive tasks, limited to making simple work-related decisions, and having occasional. . . interactions with the public.[337]

The ALJ asked whether such a person could perform the past job the VE described, and the VE answered that she could not.[338] The ALJ asked whether there were other jobs that the hypothetical person could perform, and the VE said that "housekeeping cleaner" (SVP 2, light) might be appropriate.[339] There were 400,000 of those jobs in the national economy.[340] The VE said that reaching would be "frequent" in that job, but if the hypothetical individual could reach at all levels with her right arm and reach below her shoulder with her left, it would "be a possibility."[341] The VE could not think of any other good "examples that [did not] involve public contact."[342]

The VE posed a second hypothetical:

> [A]ll the reaching and the mental limitations I gave you from hypothetical number one still apply to this one, but in this hypothetical, the individual is limited to sedentary work as defined in the regulations, meaning that she can only lift and/or carry ten pounds [] occasionally, less than ten pounds [] frequently, can stand or walk a total of two hours out of an eight-hour workday, sit for six hours out of an eight-hour workday. This individual can occasionally balance, stoop, kneel, crouch and crawl. . . .[343]

The ALJ asked whether such a person could perform the plaintiff's past job, and the VE said no.[344] The VE testified that such a person could not do any job due to the "combination of the public contact and the bimanual activity limitation[s], along with the sedentary limitation on top of all of that."[345]

---

[337] AR 79–80.

[338] AR 80.

[339] *Id.*

[340] AR 81.

[341] *Id.*

[342] *Id.*

[343] AR 82.

[344] AR 83.

[345] *Id.*

For the third hypothetical, the ALJ asked the VE to consider the restrictions in the first hypothetical, plus "[the] individual cannot handle, finger, or feel with the left upper extremity, and this individual is only limited to simple, routine repetitive tasks and making simple workplace decisions. There's no limitations on contact with the public. Does that change your testimony from hypothetical number one?"[346] The VE said the hypothetical individual would not be able to perform any job because "with a complete elimination of handling and fingering. . . it basically reduces out all of the jobs that [are] normally available at the unskilled level."[347]

The ALJ asked whether there would be jobs for a hypothetical individual described in hypothetical one, if the hypothetical removed the limitation on public contact.[348] The VE said that such an individual could be a sales attendant (SVP 2, light) or a cashier (SVP 2, unskilled).[349] The VE said that under any of the hypotheticals, the individual could be off task no more than 10% of the time.[350]

The plaintiff's attorney asked the VE whether any of the jobs she suggested would be available if the person had no use of their left-upper extremity, and the VE said that they would not.[351] The VE also testified that there "is no sit/stand option for a housekeeping cleaner."[352] Finally, the attorney asked whether a person could miss anywhere from one to four days a month for medical treatments and maintain a job.[353] The VE said "[t]hat would not be tolerated under regular competitive work situations. There might be employers who would accommodate that but it would clearly be an accommodation."[354]

---

[346] *Id.*

[347] AR 84.

[348] *Id.*

[349] AR 84–85.

[350] *Id.*

[351] AR 87.

[352] *Id.*

[353] *Id.*

[354] *Id.*

### 3.3 Administrative Findings

The ALJ followed the five-step sequential-evaluation process to determine whether the plaintiff was disabled and concluded that she was not.[355]

At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since September 6, 2013 (the amended alleged onset date).[356]

At step two, the ALJ found that the plaintiff had six severe impairments: complex regional pain syndrome, arthropathies, obesity, affective disorder, anxiety disorder, and PTSD.[357] The ALJ found that the other medical conditions "described in the medical evidence or alleged by the claimant, including diabetes mellitus, gastroesophageal reflux disease, and pancreatitis, [were] not shown to be 'severe.'"[358]

At step three, the ALJ determined that none of the listed impairments met or medically equaled the severity of a listed impairment.[359] Specifically, the ALJ evaluated whether the plaintiff's impairments met the "paragraph B" criteria for listings 12.04 (affective disorders) and 12.06 (anxiety-related disorders). [360] The ALJ held that the plaintiff had "mild restrictions" in the activities of daily living, noting that evidence demonstrated that she "has been able to drive, take care of her children, shop, read, and do household chores."[361] The ALJ found that the plaintiff had "mild difficulties" in social functioning because there was "no indication in the record that [she] has not been able to get along well with family and friends."[362] The ALJ found that "resolving all

---

[355] AR 30.

[356] Id.

[357] Id.

[358] Id.

[359] Id.

[360] AR 30–31. The paragraph B criteria is the same for listings 12.04 and 12.06. To meet the criteria, a claimant must demonstrate an "[e]xtreme limitation of one, or marked limitation of two, of the following areas of mental functioning: (1) Understand, remember, or apply information; (2) Interact with others; (3) Concentrate, persist, or maintain pace; (4) Adapt or manage oneself. 20 C.F.R. pt. 5, subpt. P, app'x 1.

[361] AR 31.

[362] Id.

inferences in her favor," the plaintiff had moderate difficulties with "concentration, persistence, or pace."[363] "Because [the plaintiff's] mental impairments [did] not cause at least two 'marked' limitations or one 'marked' limitation and repeated episodes of 'decompensation,'" the ALJ held that the paragraph B criteria were not satisfied.[364] The ALJ also held that the paragraph C requirements were not satisfied because "the record [did] not have evidence of repeated episodes of decompensation, each of extended duration; or a residual disease process that [] resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause [the plaintiff] to decompensate; or a current history of one or more years' inability to function outside a highly supportive living arrangement."[365]

At step four, the ALJ found that based on the VE's testimony, the plaintiff was unable to perform any of her past relevant work.[366] The ALJ held that the claimant had the RFC to perform "light" work as defined in 20 CFR 416.967(b).[367] She described the RFC as follows:

> "[The plaintiff could] lift and carry 10 pounds frequently and 20 pounds occasionally; sit, stand, or walk for six hours each in an eight-hour workday, and push/pull the same weight limits except with the left (non-dominant) upper extremity, she occasionally could push/pull or use hand controls, she could not reach above shoulder level, occasionally she could reach in all other directions, and she occasionally could handle and finger; no limitations with the right upper extremity. She frequently could climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. She could not climb ladders, ropes, and scaffolds. She must avoid all exposure to work environments with vibration and hazards such as work at unprotected heights or around dangerous moving machinery. She is limited to simple, routine, repetitive tasks with simple work-related decisions."[368]

The ALJ found that the plaintiff's medically determinable impairments "reasonably could be expected to cause the alleged symptoms" but that her statements "concerning the intensity, persistence[,] and limiting effects of these symptoms [were] not entirely consistent with the

---

[363] *Id.*

[364] *Id.*

[365] *Id.*

[366] AR 39.

[367] AR 31–32.

[368] *Id.*

medical evidence and other evidence in the record. . . ."[369] The ALJ gave very little weight to Dr.

Amgott Kwan's opinion, giving the following explanation:

> First, Dr. Amgott-Kwan did not indicate that he had reviewed any updated records, so his assessment of the claimant's capabilities must have been made based on his memory of from two years prior. At that time, he saw her two or three times over the course of a year, not a close treating relationship that would give the doctor a particularly insightful perspective on her condition. Second, during that time he did see her, the claimant improved and told Dr. Amgott-Kwan less than a year after the injury that she was able to use her left arm for cooking and taking care of her children; she was using her left arm more and able to gesture, and she was able to exhibit full range of motion. Third, his opinion is so at odds with that of Dr. Rana, who personally examined the claimant in April 2016, that it cannot be assigned much evidentiary weight.[370]

The ALJ concluded that Dr. Rana's assessment "best characterize[d]" the plaintiff's capability

over the course of the time period at issue.[371] The ALJ continued:

> The claimant certainly was injured and developed chronic pain, but the medical evidence indicates that she functionally improved substantially within a year. I also assign substantial weight to the conclusions of the State agency medical consultant at the reconsideration level, although he did not have all of the medical evidence to review, because his opinion is generally consistent with the longitudinal record and with Dr. Rana's opinion.[372]

After summarizing the records concerning the plaintiff's mental impairments, the ALJ

concluded that the plaintiff's psychological symptoms were "moderate."[373] The plaintiff

experienced "exacerbations of symptoms, apparently caused by opioid use, withdrawal, and

alcohol abuse, but as each of those crises resolved, the claimant returned to a stable state with

moderately severe, persistent symptoms."[374] The ALJ said this conclusion was supported by the

medical evidence (especially the opinions of Dr. Duffy and Dr. Spivey and the State agency

psychological consultant) and the "reasonably normal range of activities the claimant [was] able to

---

[369] AR 32–33.

[370] AR 35 (internal record citations omitted).

[371] AR 36.

[372] Id.

[373] AR 38.

[374] Id.

perform."[375] The ALJ did not "mean that the claimant has been fully functional, but the level of activity she has been able to maintain suggests that her symptoms are not disabling."[376] The ALJ also pointed out that her pain was under "substantial control" with medication and that physical therapy and exercise made her arm "functional."[377] "[T]reatment notes indicate that except when exacerbated by alcohol and opioid withdrawal, the claimant's [psychological] symptoms were well controlled."[378]

At step five, the ALJ determined that the plaintiff could make a successful adjustment to other work.[379] The ALJ based this finding on the VE's testimony that a hypothetical individual with the plaintiff's RFC could perform the requirements of housekeeper/cleaner (40,000 jobs in California and 400,000 jobs in the national economy), sales attendant (100,000 jobs in the national economy) and cashier (1,100,000 jobs in the national economy).[380]

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the claimant initiates a suit within sixty days of the decision. A court may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal citation and quotation marks omitted); 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995). The reviewing court should uphold "such inferences and conclusions as the [Commissioner] may reasonably draw from the evidence." *Mark*

---

[375] *Id.*

[376] *Id.*

[377] *Id.*

[378] *Id.*

[379] AR 39.

[380] AR 39–40.

*v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965). If the evidence in the administrative record supports the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *Tackett v. Apfel*, 180 F.3d 1094, 1097–98 (9th Cir. 1999). "Finally, [a court] may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

## GOVERNING LAW

A claimant is considered disabled if (1) he or she suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that. . . [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 1382c(a)(3)(A) & (B). The five-step analysis for determining whether a claimant is disabled within the meaning of the Social Security Act is as follows. *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520).

> **Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant case cannot be resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(i).
>
> **Step Two.** Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(a)(4)(ii).
>
> **Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii).
>
> **Step Four.** Considering the claimant's RFC, is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).

**Step Five.** Considering the claimant's RFC, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.

For steps one through four, the burden of proof is on the claimant. At step five, the burden shifts to the Commissioner. *Gonzales v. Sec'y of Health & Human Servs.*, 784 F.2d 1417, 1419 (9th Cir. 1986).

## ANALYSIS

The plaintiff contends that the ALJ erred by:

(1) improperly rejecting the opinions of her treating and examining doctors;

(2) improperly rejecting her testimony; and

(3) failing to base his step-five finding on substantial evidence.[381]

The plaintiff seeks remand for calculation of benefits or, alternatively, for further administrative proceedings.[382] The court grants the plaintiff's motion for summary judgment, and remands the case for reconsideration consistent with this order.

## 1. Whether the ALJ Improperly Weighed Medical-Opinion Evidence

The plaintiff argues that the ALJ erred by assigning very little weight to the opinion of the plaintiff's treating physician, Dr. Amgott-Kwan, and by not discussing state agency consultant Dr. Bilik's opinion that the plaintiff would benefit from reduced interactions with the public.[383] The court concludes that the ALJ improperly weighed the medical evidence.

---

[381] Mot. – ECF No. 26 at 14–20.

[382] *Id.* at 5.

[383] *Id.* at 15–16.

In the following paragraphs, the court first discusses the law governing the ALJ's weighing of medical-opinion evidence and then analyzes the medical-opinion evidence.

The ALJ is responsible for "'resolving conflicts in medical testimony, and for resolving ambiguities.'" *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014) (quoting *Andrews*, 53 F.3d at 1039). In weighing and evaluating the evidence, the ALJ must consider the entire case record, including each medical opinion in the record, together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *see also Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) ("[A] reviewing court [also] must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (internal quotation marks and citation omitted).

"In conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527). Social Security regulations distinguish between three types of physicians: (1) treating physicians; (2) examining physicians; and (3) non-examining physicians. 20 C.F.R. § 416.927(c), (e); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing [non-examining] physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citing *Lester*, 81 F.3d at 830); *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996).

An ALJ, however, may disregard the opinion of a treating physician, whether or not controverted. *Andrews*, 53 F.3d at 1041. "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan*, 528 F.3d at 1198 (alteration in original) (internal quotation marks and citation omitted). By contrast, if the ALJ finds that the opinion of a treating physician is contradicted, a reviewing court will require only that the ALJ provide "specific and legitimate reasons supported by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (internal quotation marks and citation omitted); *see also Garrison*, 759 F.3d at 1012 ("If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by

substantial evidence.") (internal quotation marks and citation omitted). "The opinions of non-treating or non-examining physicians may serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).

An ALJ errs when he "rejects a medical opinion or assigns it little weight" without explanation or without explaining why "another medical opinion is more persuasive, or criticiz[es] it with boilerplate language that fails to offer a substantive basis for [her] conclusion." *Garrison*, 759 F.3d at 1012–13. "[F]actors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided[,] the consistency of the medical opinion with the record as a whole[, and] the specialty of the physician providing the opinion . . .." *Orn*, 495 F.3d at 631. (citing 20 C.F.R. § 404.1527(d)(3)–(6)); *see also Magallanes v. Bowen*, 881 F.2d 747, 753 (9th Cir. 1989) (an ALJ need not agree with everything contained in the medical opinion and can consider some portions less significant than others).

### 1.1 Dr. Amgott-Kwan

Dr. Amgott-Kwan's opinion is contradicted by Dr. Rana's opinion.[384] Thus, the ALJ was required to give specific and legitimate reasons for discounting Dr. Amgott-Kwan's opinion.

The ALJ gave little weight to Dr. Amgott-Kwan's opinion for the following reasons:

> First, Dr. Amgott-Kwan did not indicate that he had reviewed any updated records, so his assessment of the claimant's capabilities must have been made based on his memory of her from two years prior. At that time, he saw her two or three times over the course of a year, not a close treating relationship that would give the doctor a particularly insightful perspective on her condition. Second, during that time he did see her, the claimant improved and told Dr. Amgott-Kwan less than a year after the injury that she was able to use her left arm for cooking and taking care of her children; she was using her left arm more and able to gesture, and she was able to exhibit full range of motion. Third, his opinion is so at odds with that of Dr. Rana, who personally examined the claimant in April 2016, that it cannot be assigned much evidentiary weight.[385]

[384] *Compare* AR 1291–93 *with* AR 1281–86.

[385] AR 35 (internal record citations omitted).

The ALJ erred by discounting Dr. Amgott-Kwan's opinion. "A treating physician's opinion is not binding on the Commissioner with respect to the existence of an impairment or the ultimate issue of disability." *Alvala v. Colvin*, Bi, SACV 12–0626 AJWW, 2013 WL 1620352, at *5 (C.D. Cal., Apr. 15, 2013) (citing *Tonapetyan v. Halter,* 242 F.3d 1144, 1148 (9th Cir. 2001)). "However, a treating physician's medical opinion as to the nature and severity of an individual's impairment is entitled to controlling weight when that opinion is well-supported and not inconsistent with other substantial evidence in the record." *Id.* (citing *Edlund v. Massanari,* 253 F.3d 1152, 1157 (9th Cir. 2001); *Holohan v. Massanari,* 246 F.3d 1195, 1202 (9th Cir. 2001)). "Even when not entitled to controlling weight, 'treating source medical opinions are still entitled to deference and must be weighed' in light of (1) the length of the treatment relationship; (2) the frequency of examination; (3) the nature and extent of the treatment relationship; (4) the supportability of the diagnosis; (5) consistency with other evidence in the record; and (6) the area of specialization). *Id.* (quoting *Edlund,* 253 F.3d at 1157 & n.6).

Here, Dr. Amgott-Kwan's medical-opinion reflects and is consistent with the plaintiff's course of treatment at Kaiser. A review of the record shows that the plaintiff suffered an injury to her left arm and shoulder in 2013 and over the course of roughly the next two years tried multiple interventions (including medication, physical therapy, and nerve-blocking procedures) without significant success or relief of symptoms.[386] His opinion—that the plaintiff's pain would "constantly" be severe enough to interfere with the "attention and concentration needed to perform even simple work tasks" and that she essentially did not have use of her left arm—is supported by this record of treatment.[387]

It is important that Dr. Amgott-Kwan was part of the plaintiff's treatment team at Kaiser. Between August 2013 and January 2016, the plaintiff had at least 24 in-person appointments with Kaiser physicians and other providers, two hospital admissions at Kaiser in Oakland, and several

---

[386] *See generally* AR 690–1291; Statement, *supra.*
[387] AR 1292.

telephone appointments with Dr. Pacheco to check on her progress.[388] While Dr. Amgott-Kwan did not see the plaintiff at each of her visits, the medical records show that he had access to the plaintiff's treatment notes from the numerous other Kaiser physicians.[389] Thus, his assessment of the plaintiff's medical conditions was predicated not only on his observations but also on the plaintiff's medical records reflecting medical assessments, treatment, and tests conducted by other providers. His assessment cannot be divorced from the plaintiff's overall treatment at Kaiser.

The fact that the plaintiff reported improved symptoms at some point during the course of treatment is not a specific and legitimate reason to reject the physician's opinion. A treating physician's statements "must be read in the context of the overall diagnostic picture he draws." *Holohan,* 246 F.3d at 1205. Dr. Amgott-Kwan's treatment notes and his medical-opinion reflect a diagnostic picture that is consistent with the plaintiff's course of treatment and may support a finding of disability. The ALJ did not provide specific and legitimate reasons supported by substantial evidence to reject Dr. Amgott-Kwan's opinion.

### 1.2 Dr. Bilik

Dr. Bilik, a state-agency psychiatrist who reviewed the plaintiff's records as part of the agency's disability determination explanations, said in his report that the plaintiff "can interact appropriately with others, but may benefit from reduced interactions with the public."[390] The plaintiff argues that the ALJ erred by not providing "reasons for failing to include the limited contact with the public in the RFC finding."[391] The court remands for reconsideration of this issue.

The ALJ noted Dr. Bilik's observation in his decision, writing that Dr. Bilik "indicated that [the plaintiff] could interact appropriately with others, but might benefit from reduced interactions with the public."[392] This recommended limitation is consistent with the plaintiff's mental-health

---

[388] *See* AR 411–1293.

[389] *See, e.g.,* AR 856 (showing Dr. Pacheco's treatment notes reflected within Dr. Amgott-Kwan's progress notes).

[390] AR 128.

[391] Mot. – ECF No. 26 at 15–16.

[392] AR 38.

medical records from Kaiser which demonstrate that the plaintiff suffered from PTSD and anxiety.[393] The plaintiff's therapist reported in June 2016 that the plaintiff "had made some improvements" in her mental health treatment but was "unable to sustain progress."[394]

The ALJ's RFC determination took "into account [the plaintiff's] partially consistent statements about her ability to function, along with the medical opinions about her abilities," but did not include the limitation on interactions with the public recommended by Dr. Bilik.[395] Because the court remands the case for reconsideration of the medical-opinion evidence in light of the plaintiff's extensive course of treatment at Kaiser, the court remands on this issue as well.

### 2. Whether the ALJ Erred by Improperly Rejecting the Plaintiff's Testimony

The plaintiff argues that the ALJ erred by not specifying which parts of her testimony he found not credible and by failing to provide clear and convincing reasons supported by evidence in the record to support his credibility determination.[396] The court agrees with the plaintiff.

In assessing a claimant's credibility, an ALJ must make two determinations. *Molina*, 674 F.3d at 1112. "First, the ALJ must determine whether [the claimant has presented] 'objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* (quoting *Vasquez*, 572 F.3d at 591). Second, if the claimant produces that evidence, and "there is no evidence of malingering," the ALJ must provide "specific, clear and convincing reasons for" rejecting the claimant's testimony regarding the severity of the claimant's symptoms. *Id.* (internal quotation marks and citations omitted).

"At the same time, the ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" *Id.* at 1112 (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). "Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness,

---

[393] *See, e.g.,* AR 806, 1268.

[394] AR 1235.

[395] AR 39.

[396] Mot. – ECF No. 26 at 18.

inconsistencies in testimony or between testimony and conduct, daily activities, and unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Orn*, 495 F.3d at 636 (internal punctuation omitted). "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014); *see, e.g.*, *Morris v. Colvin*, No. 16-CV-0674-JSC, 2016 WL 7369300, at *12 (N.D. Cal. Dec. 20, 2016).

The ALJ found the following about the plaintiff's testimony:

> The claimant. . . stated that she had no use of her left arm, drowsiness from her medications, confusion, a short temper due to pain and depression, no interest in everyday things, crying, and should and neck pain on the left []. She stated that on a typical day, she got her children ready for school, watched television, took naps, and prepared some meals. She indicated that her children's grandmother and [her] older child helped with childcare and other household chores. She was able to drive a car on a limited basis, shop for an hour once a month, pay bills, read, listen to music, watch movies, and go out to eat with family but she no longer socialized with friends. She wrote that she could not handle stress or changes in routine and did not like to go out alone. She used an arm brace or sling when in public and occasionally at home.

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments reasonably could be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.[397]

The ALJ satisfied the first step of the two-step inquiry when he determined that the plaintiff's medically determinable impairments "reasonably could be expected to cause some of the symptoms alleged."[398] *See Molina,* 674 F.3d at 1112. But the ALJ did not provide any evidence or find that the plaintiff was a malingerer. Indeed, her testimony is consistent with the Kaiser treatment records. Accordingly, the ALJ needed to provide "specific, clear, and convincing reasons" for rejecting the plaintiff's testimony regarding the severity of her symptoms. *Id.* (internal quotation marks and citations omitted).

---

[397] AR 32–33. The ALJ stated that the plaintiff was "able to drive a car on a limited basis" but at the time of the hearing the plaintiff testified that she had stopped driving completely and did not have a driver's license. AR 62, 67.

[398] AR 32.

1    Because the ALJ discredited the plaintiff's testimony in part on his assessment of the medical-

2    opinion evidence, including Dr. Amgott-Kwan's medical-opinion, the court remands on this

3    ground too. The ALJ can reassess the plaintiff's credibility in context of the entire record.

### 3. Whether the ALJ's Step-Five Determination Is Supported by Substantial Evidence

The plaintiff argues that two of the three occupations that the ALJ found the plaintiff could perform — "sales attendant" and "cashier II" — have GED Reasoning Levels that are inconsistent with the ALJ's RFC.[399]

The ALJ's RFC determination was based on his assessment of the medical-opinion evidence and the plaintiff's credibility. Given the court's remand on the medical-opinion evidence, the court remands on this issue too.

### CONCLUSION

The court grants the plaintiff's motion for summary judgment, denies the Commissioner's motion for summary judgment, and remands the case for reconsideration consistent with this order.

**IT IS SO ORDERED.**

Dated: June 3, 2019

_____

LAUREL BEELER
United States Magistrate Judge

---

[399] Mot. – ECF No. 26 at 19.